UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

**BONNIE L. BARNELL**,                                Case No. 1:14-cv-00283-KI

                    Plaintiff,                        OPINION AND ORDER

        v.

**COMMISSIONER, Social Security
Administration**,

                    Defendant.


        Arthur W. Stevens, III
        Black, Chapman, Webber & Stevens
        221 Stewart Ave., Ste. 209
        Medford, OR 97501

                Attorney for Plaintiff


        S. Amanda Marshall
        United States Attorney
        District of Oregon

Page 1 - OPINION AND ORDER

Ronald K. Silver
Assistant United States Attorney
1000 S.W. Third Ave., Ste. 600
Portland, OR 97201-2902

Leisa A. Wolf
Special Assistant United States Attorney
Office of the General Counsel
Social Security Administration
701 Fifth Ave., Ste. 2900 M/S 221A
Seattle, WA 98104-7075

      Attorneys for Defendant

KING, Judge:

Plaintiff Bonnie L. Barnell brings this action pursuant to section 205(g) of the Social Security Act, as amended, 42 U.S.C. § 405(g), to obtain judicial review of a final decision of the Commissioner denying plaintiff's application for disability insurance benefits ("DIB"). I affirm the decision of the Commissioner.

## BACKGROUND

Barnell filed an application for a period of disability and DIB on April 2, 2010, alleging disability beginning February 8, 2010. The application was denied initially and upon reconsideration. After a timely request for a hearing, Barnell, represented by counsel, appeared and testified before an Administrative Law Judge ("ALJ") on May 1, 2012.

On May 22, 2012, the ALJ issued a decision finding Barnell not disabled within the meaning of the Act and therefore not entitled to benefits. This decision became the final decision of the Commissioner when the Appeals Council declined to review the decision of the ALJ on December 17, 2013.

Page 2 - OPINION AND ORDER

## DISABILITY ANALYSIS

The Social Security Act (the "Act") provides for payment of disability insurance benefits to people who have contributed to the Social Security program and who suffer from a physical or mental disability. 42 U.S.C. § 423(a)(1). In addition, under the Act, supplemental security income benefits may be available to individuals who are age 65 or over, blind, or disabled, but who do not have insured status under the Act. 42 U.S.C. § 1382(a).

The claimant must demonstrate an inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to cause death or to last for a continuous period of at least twelve months. 42 U.S.C. §§ 423(d)(1)(A) and 1382c(a)(3)(A). An individual will be determined to be disabled only if his physical or mental impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy. 42 U.S.C. §§ 423(d)(2)(A) and 1382c(a)(3)(B).

The Commissioner has established a five-step sequential evaluation process for determining if a person is eligible for either DIB or SSI due to disability. The evaluation is carried out by the ALJ. The claimant has the burden of proof on the first four steps. Parra v. Astrue, 481 F.3d 742, 746 (9th Cir. 2007); 20 C.F.R. §§ 404.1520 and 416.920. First, the ALJ determines whether the claimant is engaged in "substantial gainful activity." 20 C.F.R. §§ 404.1520(b) and 416.920(b). If the claimant is engaged in such activity, disability benefits are denied. Otherwise, the ALJ proceeds to step two and determines whether the claimant has a medically severe impairment or combination of impairments. A severe impairment is one

"which significantly limits [the claimant's] physical or mental ability to do basic work activities[.]"  20 C.F.R. §§ 404.1520(c) and 416.920(c).  If the claimant does not have a severe impairment or combination of impairments, disability benefits are denied.

If the impairment is severe, the ALJ proceeds to the third step to determine whether the impairment is equivalent to one of a number of listed impairments that the Commissioner acknowledges are so severe as to preclude substantial gainful activity.  20 C.F.R. §§ 404.1520(d) and 416.920(d).  If the impairment meets or equals one of the listed impairments, the claimant is conclusively presumed to be disabled.  If the impairment is not one that is presumed to be disabling, the ALJ proceeds to the fourth step to determine whether the impairment prevents the claimant from performing work which the claimant performed in the past.  If the claimant is able to perform work she performed in the past, a finding of "not disabled" is made and disability benefits are denied.  20 C.F.R. §§ 404.1520(f) and 416.920(f).

If the claimant is unable to perform work performed in the past, the ALJ proceeds to the fifth and final step to determine if the claimant can perform other work in the national economy in light of his age, education, and work experience.  The burden shifts to the Commissioner to show what gainful work activities are within the claimant's capabilities.  Parra, 481 F.3d at 746.  The claimant is entitled to disability benefits only if he is not able to perform other work.  20 C.F.R. §§ 404.1520(g) and 416.920(g).

## STANDARD OF REVIEW

The court must affirm a denial of benefits if the denial is supported by substantial evidence and is based on correct legal standards.  Molina v. Astrue, 674 F.3d 1104, 1110 (9th Cir. 2012).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as

adequate to support a conclusion" and is more than a "mere scintilla" of the evidence but less

than a preponderance.  Id. (internal quotation omitted).  The court must uphold the ALJ's

findings if they "are supported by inferences reasonably drawn from the record[,]" even if the

evidence is susceptible to multiple rational interpretations.  Id.

### THE ALJ'S DECISION

The ALJ concluded Barnell has the following severe impairments:  degenerative

osteoarthritis of the lumbosacral spine with compression deformity of L5, anterolisthesis (L4 on

L5),[1] facet arthropathy, and levoscoliosis; varicose veins on the right lower extremity; and a

depressive disorder.  The ALJ also found that these impairments, either singly or in combination,

did not meet or medically equal the requirements of any of the impairments listed in 20 C.F.R.

§ 404, Subpart P, Appendix 1.  Given these impairments, the ALJ concluded Barnell can perform

a full range of light work and, thus, is capable of performing her past relevant work as a teller, a

front office worker, and a Raimann-machine operator.

### FACTS

Born in 1949, Barnell was sixty at the time of her alleged disability onset.  She had

worked as a hairdresser, dental assistant, Raimann-machine operator (plugging holes in veneer),

and most recently as a bank teller.

Barnell injured her back–a severe L5 compression fracture–in a 1998 car accident and

underwent surgery to repair the break.  She experienced pain off and on over the years, as well as

numbness and tingling in her right lower extremity, but was able to work full-time.  Her last job

---

[1]"[F]orward displacement of a vertebral body with respect to the vertebral body
immediately below it, due to congenital anomaly, degenerative change, or trauma."  medical-
dictionary.thefreedictionary.com/anterolisthesis (last visited Apr. 9, 2015).

as a bank teller ended in February 2010 when she was fired for making an error–she had a $1,000 discrepancy in her till.

Ahmed Taher, M.D., treated Barnell's back pain and depression. Just one month before Barnell was fired, Dr. Taher examined Barnell for a follow-up on her medications. She reported feeling less depressed and "doing well" on Neurontin for her chronic pain. Tr. 413. She denied any problems with side effects. Her examination was normal overall; she indicated "no vertebral, paravertebral, or CVA tenderness" and she displayed "grossly normal ROM in joints, no joint tenderness or muscle weakness." Id. She was to return in a year, or sooner if she had problems. No changes to her medications were made.

On April 9, 2010, seven days after she filed for disability, she returned to Dr. Taher complaining of severe back pain and reporting she was no longer able to work because of it. She reported she was fired from her job for making a mistake "which she attributes to the pain and the medication she takes for pain." Tr. 410. Upon examination, she displayed tenderness in the right lumbosacral area, sat with a stiff posture, and moved in a slow and deliberate manner. She sought past x-rays and MRIs to support her disability application. Dr. Taher opined "[s]he may certainly qualify for disability," but that he was not a disability specialist. Tr. 411. He made no changes to Barnell's medication regimen and she declined a routine follow-up appointment.

Dr. Taher filled out a "Mental Status Report" for Barnell in July 2010, in which he documented a history of L5 comminuted[2] fracture and a history of L5 fracture. He reported Barnell's current back pain with leg burning and numbness was worsened with sitting or

---

[2]"[B]roken or crushed into small pieces[.]"  medical-dictionary.thefreedictionary.com/comminuted (last visited Apr. 9, 2015).

standing, and relieved by lying down.  He believed she was sincere.  Tr. 295-97.  He prescribed

Percocet.  Tr. 408.  At a follow-up later that month, he noted Barnell was controlling her pain

with two Percocet a day.  Barnell declined a referral to the pain management clinic.

In August 2010, Barnell informed Dr. Taher she could not get on top of her significant

pain; Dr. Taher increased her Percocet to three times a day.

Derrick J. Sorweide, D.O., examined Barnell at Disability Determination Services'

request seven days later.  He noted Barnell could sit, stand and walk without difficulty.  She was

able to lift her legs off the table while seated.  She was able to stand and get on to the exam table

without any problem, although she said she was unable to move her ankles and knees.  Barnell

could get her fingers to within six inches of her toes while standing with legs straight.  She had

no muscle spasms.  She displayed strength in her upper and lower extremities of 5/5.  She was

not able to heel/toe walk.  Dr. Sorweide reported "[l]ots of psychiatric overlay and

embellishment. . . . Symptoms increased dramaticly [sic] with having her remove her back brace–

which has no real physiologic benefit.  Lots of shaking and pain behavior.  Poor overall effort."

Tr. 310.  Dr. Sorweide found Barnell's physical examination to be "pretty much normal except

for her pain behavior, emotional status."  Id.  He thought increased activity would help.  He

believed she could work full-time, had no positional limitations, but was limited to lifting and

carrying 10 pounds frequently and 20 pounds occasionally.

Imaging also obtained by DDS reflected degenerative arthritis of the lower lumbar spine,

mild loss of disk space height between L4 and L5, compression deformity of the L5 vertebral

body, mild grade 1 anterolisthesis of L4 on L5, associated facet arthropathy within the lower

lumbar spine, mild lumbar levoscoliosis, and atheromatous arterial calcification.  Tr. 305.

By September 2010, Barnell reported to Dr. Taher decent pain control on Percocet, without any side effects.  Dr. Taher increased Barnell's Neurontin to treat her neuropathic symptoms; she reported no problems with any side effects.  Because she would be traveling beginning October 3, Dr. Taher allowed an early refill.

In November 2010, she reported significant pain despite the Percocet; she was "not completely debilitated but has to be careful what she does."  Tr. 396.  In response to her complaints of foot pain, Dr. Taher referred her for a podiatry evaluation; he thought her symptoms were consistent with neuroma[3] but could be a component of peripheral neuropathy.

Rick McClure, DPM, examined Barnell in December.  Barnell graded the pain in her foot at 5/10, reported it occurred daily and was exacerbated by activity.  She admitted that while she had been prescribed Neurontin, she had not been using it.  Dr. McClure directed her to take the Neurontin and also prescribed Metanx.  In February 2011, Barnell reported the Neurontin and Metanx were helping; she had no side effects.

Alan P. Mersch, D.O., a doctor in Dr. Taher's office, checked up on Barnell in January and again in April 2011.  Barnell discussed her upcoming trip to Buffalo, NY by train, they discussed her medications, and he answered questions about menopause.

Dr. Taher examined Barnell in June 2011, after Barnell's disability application had been denied.  Barnell was taking two Percocet at a time to control her pain; she reported her right leg felt weak and sensation was decreased.  Dr. Taher increased the strength of her Percocet.  He reported being "surprised that she was turned down for disability given the extent of her back

---

[3]"[A] tumor growing from a nerve or made up largely of nerve cells and nerve fibers." medical-dictionary.threfreedictionary.com/neuroma (last visited Apr. 9, 2015).

injuries." Tr. 385.  He completed a form opining "L5 radiculopathy –per Dr. Greenberg's note 9-15-2004," reported his findings on her reduced foot and leg strength, noted her inability to heel/toe walk and squat, and commented she "may have ? peripheral neuropathy on R."  Tr. 338-39.  By July, Barnell's back pain was so bad at times that "she just wants to lay down and die." Tr. 381.  Dr. Taher prescribed morphine, with Percocet for break-through pain.

By August 2011, according to Dr. McClure's records, Barnell's foot pain had completely resolved with use of Neurontin and Metanx.  Additionally, Barnell reported to Dr. Taher that her "back pain is under good control on her medications."  Tr. 378.  She requested an early medication refill because she was going on vacation.

In November 2011, Barnell reported severe pain at times, despite morphine, Percocet, Neurontin, and trazodone  She described sometimes feeling like "she has a boil in her spine." Tr. 374.  Dr. Taher referred Barnell to the Providence spine program for further evaluation.

Michael D. Barker, P.A., at the spine program, examined Barnell in December 2011; he ordered an x-ray, MRI and an epidural injection to help treat her back pain.  If the injection was not successful, he recommended a referral to a back surgeon.

The subsequent radiologic studies revealed a "[m]ild but old compressive change L5" and "[g]rade I spondylolisthesis[4] and spondylosis[5] at L4-5 without central stenosis and only mild foraminal narrowing."  Tr. 358.

---

[4]"[F]orward displacement of a vertebra over a lower segment, usually of the fourth or fifth lumbar vertebra."  medical-dictionary.thefreedictionary.com/spondylolistheis (last visited Apr. 9, 2015).

[5]"[A]nkylosis [stiffening or immobility] of a vertebral joint."  medical-dictionary.thefreedictionary.com/spondylosis and ankylosis (last visited Apr. 9, 2015).

At her appointment with Dr. Taher in January 2012, Barnell requested early refills because she was going to Arizona to assist her mother.

On January 11, 2012, Barnell received an L4-5 epidural steroid injection through the spine program.  In April, at her appointment with Barker, she reported the injection helped for two or three days, but the pain returned.  She reported back pain, thigh pain, and calf pain, with numbness in both legs.  She walked with a very slow antalgic gait and she leaned forward when she sat.  She rocked back and forth when standing to help get her mind off the pain.  Although conceding the radiologist saw no central canal stenosis or foraminal stenosis, Barker assessed anterolisthesis at L4 and L5, facet arthropathy, and radicular pain due to central canal and foraminal stenosis at L4-L5.  That month, Dr. Taher increased her Neurontin to twice a day after discussing the most recent radiological results.

On May 1, 2012, Andy J. Kranenburg, at Southern Oregon Orthopedics, examined Barnell, who reported back pain at a level 6 out of 10, with aching, burning, stabbing pain.  She reported radiating pain from her tailbone up her back and out into her hips, with numbness in her right leg, cramping in both calves, and burning pain on the bottoms of both feet.  Dr. Kranenburg reported Barnell's gait was guarded but non-antalgic.  Her range of motion was grossly normal.  Forward flexion was only 20% of normal, and she began shaking in her back and legs for an unknown reason.  The doctor reported, "When asked to do resisted knee extension, her legs begin shaking and do not stop until she is distracted and talking about something else." Tr. 491.  Dr. Kranenburg recommended EMG testing to clarify whether there was any pressure on her nerves because it looked like her back had healed.  He noted possible spondylolisthesis at L4-5, some

symptoms of neuropathy, and "[a]bnormal non-anatomic neurologic findings and non-anatomic

pain complaints."  Tr. 492.

On June 5, 2012, after the ALJ had issued his decision, Daniel A. Saviers, M.D., ran

neurodiagnostic studies on Barnell and found no evidence of myopathy or bilateral lumbosacral

radiculopathy.  Tr. 445.  He did note mild bilateral tibial mononeuropathy, tarsal tunnel

syndrome at the ankles, perineal mononeuropathy, mild general sensory motor peripheral

polyneuropathy with borderline mild conduction slowing.

Dr. Kranenburg reviewed the test results with Barnell a few weeks later.  He underscored

no evidence of lumbosacral radiculopathy.  He reported a suggestion of a general sensory and

motor peripheral neuropathy and symptoms consistent with bilateral tarsal tunnel syndrome and

peroneal neuropathy at the knees.  Since the lumbar epidural steroid injection had been

unhelpful, he sent her for bilateral medial branch blocks targeting the L5-S1 level.  She

underwent an L5-S1 facet joint medial branch block in July 2012.

## DISCUSSION

I.      Severity of Impairments

Barnell asserts the ALJ erred in failing to consider her foot pain as a severe impairment.

An impairment is considered not severe if it does "not have more than a minimal effect on the

person's physical or mental ability(ies) to perform basic work activities."  Social Security Ruling

85-28.  As the ALJ pointed out, Dr. McClure reported the medication he prescribed Barnell for

her foot pain, which she said had bothered her since approximately May 2010 even though her

first report of it was in November 2010, was "helping very well" as of February 2011 and by

August 2011 she reported the medication "is resolving all her pain."  Tr. 23; see also Tr. 54

(Barnell testified during hearing that medication "decreased [pain] extremely" in her foot).  The ALJ concluded Barnell's foot pain was not a severe impairment.  Even if it were, he concluded her symptoms were controlled by February 2011.  Since Barnell reported experiencing pain at a 5/10 level in November, without medication, and only three months later reported medications were "helping very well," I conclude there is substantial evidence for the ALJ to determine that Barnell's foot pain did not qualify as a medically severe impairment.

II.    Plaintiff's Credibility

The ALJ found plaintiff's reports and testimony about her limitations not entirely credible for the following reasons:  (1) the objective medical evidence does not substantiate her complaints; (2) her treatment has been conservative; (3) her explanation for being fired–pain and side effects of medication–is not supported by the evidence; (4) evidence of symptom exaggeration; and (5) her daily activities are not consistent with her stated limitations.

When deciding whether to accept the subjective symptom testimony of a claimant, the ALJ must perform a two-stage analysis.  In the first stage, the claimant must produce objective medical evidence of one or more impairments which could reasonably be expected to produce some degree of symptom.  Lingenfelter v. Astrue, 504 F.3d 1028, 1036 (9th Cir. 2007).  The claimant is not required to show that the impairment could reasonably be expected to cause the severity of the symptom, but only to show that it could reasonably have caused some degree of the symptom.  In the second stage of the analysis, the ALJ must assess the credibility of the claimant's testimony regarding the severity of the symptoms.  Id.  The ALJ "must specifically identify the testimony she or he finds not to be credible and must explain what evidence undermines the testimony."  Holohan v. Massanari, 246 F.3d 1195, 1208 (9th Cir. 2001).  General

findings are insufficient to support an adverse credibility determination and the ALJ must rely on substantial evidence. Id. "[U]nless an ALJ makes a finding of malingering based on affirmative evidence thereof, he or she may only find an applicant not credible by making specific findings as to credibility and stating clear and convincing reasons for each." Robbins v. Soc. Sec. Admin., 466 F.3d 880, 883 (9th Cir. 2006).[6]

With respect to the first reason–objective medical evidence–although the ALJ cannot reject subjective pain testimony solely because it was not fully corroborated by objective medical evidence, medical evidence is still a relevant factor in determining the severity of the pain and its disabling effects. Rollins v. Massanari, 261 F.3d 853, 857 (9th Cir. 2001). The ALJ relied on the imaging studies, which reflected relatively mild findings, as well as the lack of evidence to support radiculopathy. While Dr. Taher's tests indicated Barnell's limited spine movement and muscle weakness, he found no positive straight-leg raising and he opined that any sensory loss in the right leg was due to possible peripheral neuropathy. He also based his conclusion about lumbar radiculopathy on another doctor's note, which is not in the record as far as I can tell and, in any event, was from almost seven years earlier. In addition, the ALJ pointed to Dr. Sorweide's examination of Barnell, which was normal. As I discuss below, medical evidence generated after the ALJ's opinion confirms the ALJ's reading of the medical record.

The ALJ was also entitled to question Barnell's explanation for being fired in February 2010. Barnell attributed the loss of her job to pain and medication-related concentration

---

[6]The Commissioner preserves for appeal her disagreement with use of the clear and convincing standard, rather than the more deferential regulatory requirement for factual findings supported by substantial evidence. Def.'s Br. 9-10. The Ninth Circuit has rejected her arguments. See Burrell v. Colvin, 755 F.3d 1133 (9th Cir. 2014) (reasserting that the ALJ must provide "specific, clear and convincing reasons" to support a credibility analysis).

problems.  However, as the ALJ recognized, the contemporaneous evidence simply does not support Barnell's statement.  In fact, the month before she was fired, Barnell told Dr. Taher she was "doing well" on Neurontin.  She was not taking any other pain medications at that time.  She specifically denied any side effects of the Neurontin.  Even after she was fired and sought an appointment with Dr. Taher, she did not seek any additional pain medications.  Dr. Taher did not begin prescribing Percocet for Barnell until July–one to two pills every six hours–which she told him was controlling her pain at a follow-up appointment later that month.  Although she remembered at one point feeling sedated on morphine at some point in the past, she never reported any side effects from any of her medications while taking them.  Compare Tr. 408 (remembering morphine as being sedating) with Tr. 383 (no difficulty with morphine).  Barnell's inconsistent statements regarding her pain level at the time she was fired, and the side effects of her medications, are clear and convincing reasons to question her credibility.  See Tommasetti v. Astrue, 533 F.3d 1035, 1039 (9th Cir. 2008) (less than candid testimony is valid credibility consideration).

Similarly, the ALJ noted Dr. Sorweide's opinion that Barnell was exaggerating her symptoms.  A tendency to exaggerate symptoms is another valid reason to support a negative credibility finding.  Tonapetyan v. Halter, 242 F.3d 1144, 1148 (9th Cir. 2001).  Although Barnell questions the ALJ's reliance on Dr. Sorweide's observations, over her treating physician's views, Dr. Sorweide's perceptions are corroborated by his own objective clinical tests.  See Molina v. Astrue, 674 F.3d 1104, 1113 (9th Cir. 2012) (ALJ could support credibility conclusion with examining psychiatrist's reports about claimant's demeanor).  Further, other evidence in the record supports Dr. Sorweide's conclusion that Barnell was difficult to test and displayed

"[a]bnormal non-anatomic neurologic findings and non-anatomic pain complaints."  Tr. 492.

Harman v. Apfel, 211 F.3d 1172, 1180 (9th Cir. 2000) (additional evidence presented to the

Appeals Council but not seen by the ALJ may be considered in determining if the ALJ's denial of

benefits is supported by substantial evidence); Brewes v. Comm'r of Soc. Sec. Admin., 682 F.3d

1157, 1163 (9th Cir. 2012) (additional evidence presented to Appeals Council must be considered

in determining if ALJ's denial of benefits is supported by substantial evidence).

  To a lesser extent, because it is not as persuasive, Barnell's treatment and long gaps

between appointments is a relevant consideration.  Barnell wore a back brace when needed for

pain.  She also testified that ice and ibuprofen reduced her symptoms.  Medical records reflect

Percocet–which she did not start until four months after she was fired–and then morphine

controlled Barnell's pain for many months.  Tr. 407 (7/23/2010–two Percocet a day controlling

pain); Tr 405 (8/13/10–"can't get on top of" pain); Tr. 402 (9/13/10–"decent pain control on the

Percocet"); Tr. 396 (11/2/10–not debilitated, but significant pain; but not taking prescribed

Neurontin); Tr. 394 (1/24/2011–no reference to pain); Tr. 387 (4/25/2011–"chronic pain

management follow-up" but no description of pain); Tr. 384 (6/6/11–"pain is worse"); Tr. 381

(7/11/11–pain so bad "wants to lay down and die"); Tr. 378 (8/11/11–"back pain is under good

control"); Tr. 374 (11/28/11–worsened pain); Tr. 372 (1/6/12–discussed epidural, but no

description of pain); Tr. 369 (4/16/12–"having more pain").  It was not until the spring of 2012,

just before Barnell's disability hearing, that anyone suggested the possibility of a surgical

consultation and that suggestion came from a physician's assistant.  Barnell testified that she was

afraid of surgery, but other than Barker's mention of a possible surgical consultation the medical

records do not reflect any discussion about surgical intervention of any kind.  Parra v. Astrue,

481 F.3d 742, 750-51 (9th Cir. 2007) (evidence of conservative treatment is sufficient to discount a claimant's testimony on the severity of an impairment).

Finally, the ALJ identified Barnell's daily activities as a reason to question her credibility. I am not persuaded that Barnell's concession that she walked one to two miles on a treadmill "to help keep my muscles working," when read in the context of her entire statement, describing her need to lie down afterward due to pain, is a clear and convincing reason. Tr. 240. Similarly, while she has no problem taking care of herself, can drive, can shop, and spends time watching television, reading, and crocheting, these reports are neither inconsistent with Barnell's testimony nor demonstrate an ability to work. Compare Tr. 240 (written statement describing same activities) with Tr. 59-60 (testimony about limitations).

The ALJ also indicated Barnell's travel on four occasions was inconsistent with her report that she might miss six to eight days of work a month; the ALJ opined Barnell could not possibly make any vacation plans if she could not accurately predict when she would be incapacitated. The ALJ elicited no information about one of the vacations–in October 2010. Tr. 402. Barnell explained that her April 2011 travel to Buffalo, NY was by train to attend her daughter's graduation; she chose to travel by train so she could lie down in the sleeper car. Tr. 68; 387. Additionally, she thought her August 2011 and January 2012 trips were to Arizona to care for her mother who has dementia. Tr. 379. She explained that her husband traveled with her and that she was able to care for her pain just as she did at home. Tr. 57-59; 372. These trips are not evidence of an ability to work, nor are they inconsistent with Barnell's testimony about her limitations. Nevertheless, the fact that the ALJ improperly considered some reasons for finding

plaintiff's credibility undermined does not mean that the ALJ's entire credibility assessment is improper.  Batson v. Comm'r of Soc. Sec. Admin., 359 F.3d 1190, 1197 (9th Cir. 2004).

Accordingly, I conclude the ALJ gave several clear and convincing reasons supported by substantial evidence to question Barnell's credibility regarding the extent of her pain and, as a result, I may not "engage in second-guessing" of the ALJ's decision.  Tommasetti, 533 F.3d at 1039.

III.    Medical Evidence

Barnell objects to the ALJ's rejection of Dr. Taher's diagnosis of L5 radiculopathy.  She also contends Dr. Taher's clinical findings on her range of motion, muscle weakness, motor loss, and sensory or reflex loss support a finding of disability.

The weight given to the opinion of a physician depends on whether the physician is a treating physician, an examining physician, or a nonexamining physician.  More weight is given to the opinion of a treating physician because the person has a greater opportunity to know and observe the patient as an individual.  Orn v. Astrue, 495 F.3d 625, 632 (9th Cir. 2007).  If a treating or examining physician's opinion is not contradicted by another physician, the ALJ may only reject it for clear and convincing reasons.  Id. (treating physician); Widmark v. Barnhart, 454 F.3d 1063, 1067 (9th Cir. 2006) (examining physician).  Even if it is contradicted by another physician, the ALJ may not reject the opinion without providing specific and legitimate reasons supported by substantial evidence in the record.  Orn, 495 F.3d at 632; Widmark, 454 F.3d at 1066.  The opinion of a nonexamining physician, by itself, is insufficient to constitute substantial evidence to reject the opinion of a treating or examining physician.  Widmark, 454 F.3d at 1066 n.2.

Page 17 - OPINION AND ORDER

Because Dr. Taher was contradicted by both non-examining state agency physicians as well as a consultative examining physician, the ALJ was required to give specific and legitimate reasons for discounting Dr. Taher's opinions.[7]

As I indicated above, to the extent the ALJ relied on Barnell's report of vacations and walking one to two miles to give less weight to Dr. Taher's report, the ALJ's reasoning is not persuasive.

With respect to any radiculopathy, as the ALJ pointed out, Dr. Taher's opinion was based on another doctor's note from seven years before, which is not in the record.  Tr. 23; see Batson, 359 F.3d at 1195 (ALJ not required to accept the opinion of a physician, even a treating physician, if the opinion is "brief, conclusory, and inadequately supported by clinical findings").  Further, the compression fracture was deemed "mild" with no central canal stenosis and only mild foraminal narrowing.  Dr. Taher believed any sensory loss in Barnell's right leg was due to "*possible* peripheral neuropathy."  Tr. 23; 339 (emphasis added).  The ALJ found no evidence of nerve root involvement and no *confirmation* of peripheral neuropathy.  The first note of neuropathy appears in September 2010 in which Dr. Taher reports Barnell has "neuropathic symptoms" which are better on Neurontin.  Tr. 402.  When Barnell first reported foot pain, Dr. Taher assessed the cause as Morton's Neuroma, and not likely peripheral neuropathy.  Tr. 398. The medical evidence generated after the ALJ's opinion confirms the ALJ's reading of the medical record.  According to Dr. Kranenburg, Barnell "has no evidence of lumbosacral radiculopathy.  She has suggestion of a general sensory and motor peripheral neuropathy and

---

[7]Since I make this finding, I need not address the Commissioner's invitation to ignore Ninth Circuit "clear and convincing" jurisprudence in favor of "substantial evidence" that need be neither compelling nor convincing.  Def.'s Br. 4-5.

symptoms consistent with bilateral tarsal tunnel syndrome and peroneal neuropathy at the knees." Tr. 505; see Harman, 211 F.3d at 1180 (additional evidence presented to the Appeals Council but not seen by the ALJ may be considered in determining if the ALJ's decision is supported by substantial evidence).

In addition, although he expressed surprise that Barnell was denied disability, Dr. Taher never gave an opinion about whether Barnell could work despite her repeated requests that he give such an opinion. In my view, his expression of surprise about the disability denial is an insufficient opinion to require a justification to reject it. Nevertheless, the ALJ gave a reason, finding Dr. Taher's surprise was unwarranted given Barnell's conservative treatment and lack of credibility. As I indicated above, Barnell's statements about the reason for losing her job are simply unsupported by the contemporaneous evidence. Additionally, Dr. Sorweide's opinion about Barnell's emotional overlay is relevant evidence on which the ALJ could rely in questioning the validity of Dr. Taher's observations. Tommasetti v. Astrue, 533 F.3d 1035, 1041 (9th Cir. 2008) (physician's opinion of disability may be rejected if it is "based to a large extent on a claimant's self-reports that have been properly discounted as incredible").

Further, at the time Dr. Taher made the comment in June 2011, he had been treating Barnell conservatively with Percocet and Neurontin and had achieved some success. Dr. Taher did not begin prescribing Percocet for Barnell until July–one to two pills every six hours–which she told him was controlling her pain at a follow-up appointment later that month. Her reports of pain from then on were intermittent: she reported pain in August 2010, doing well in September, pain in November, no reports of pain in January and April 2011, and increased pain in June at the appointment where she reported her disability claim had been denied.

Barnell asks me to find the ALJ in error because she says Dr. Taher made statements consistent with her functional limitations.  However, the fact of the matter is that no physician who examined Barnell found her disabled or unable to engage in light work activity; in fact, Dr. Taher specifically declined to assess Barnell's functional limitations.  Matthews v. Shalala, 10 F.3d 678, 680 (9th Cir. 1993) (no doctor expressed opinion of total disability; thus substantial evidence supported finding of non-disability).  Although Barnell demands a different reading of the record, the ALJ supported his conclusions with specific and legitimate reasons supported by substantial evidence in the record.

IV.    Ronald Barnell's Testimony

Barnell objects to the ALJ's treatment of her husband's written submissions.  Her husband wrote that Barnell spends her days performing housework as able, as well as watching television, reading, and crocheting, but she can no longer golf, bowl, dance, or engage in other physical activities.  She has trouble sleeping, but can perform personal care.  She prepares full meals on a daily basis that, depending on her pain, take her 45 minutes to two hours to cook.  She can clean and do laundry daily, as pain allows.  She can drive, can travel alone, and she shops for food for one to two hours every two weeks.  She can only lift five pounds, can only sit and stand for a short time, and can walk one block at a time a few steps at a time.   According to her husband, Barnell was prescribed a back brace in 1999 and wears it to help control her pain.  He also submitted an affidavit explaining how Barnell tolerated the vacations by lying down, and that she has very bad days where she "withdraws" four to eight times a month.

The ALJ gave "less weight" to Mr. Barnell's report to the extent it was inconsistent with the RFC the ALJ adopted.  The ALJ gave several reasons for his opinion:  (1) the objective

Page 20 - OPINION AND ORDER

medical evidence does not support his observations, such as that Barnell can only lift five pounds and walk only one block; (2) Barnell's conservative treatment history is not consistent with the extreme limitations; (3) to the extent Mr. Barnell relies on his wife's statements, she is not credible; (4) Mr. Barnell's observations do not reflect his wife's actual abilities; and (6) Mr. Barnell has an economic interest in the outcome of the decision.

Lay testimony about a claimant's symptoms is competent evidence which the ALJ must take into account unless he gives reasons for the rejection that are germane to each witness. Stout v. Commissioner of Soc. Sec. Admin., 454 F.3d 1050, 1053 (9th Cir. 2006).

Mere suspicion of economic benefit is not a germane reason to question testimony. See Valentine v. Comm'r of Soc. Sec. Admin., 574 F.3d 685, 694 (9th Cir. 2009). Nevertheless, the ALJ gave several germane reasons to give less weight to Mr. Barnell's observations. Indeed, Mr. Barnell's report about his wife's functional abilities contained the same information as her own report and testimony. Since the ALJ properly found Barnell not fully credible, he was permitted to reject her husband's testimony for the same reason. Id.

## CONCLUSION

The findings of the Commissioner are based upon substantial evidence in the record and the correct legal standards. For these reasons, the court affirms the decision of the Commissioner.

IT IS SO ORDERED.

DATED this ____15th____ day of April, 2015.

> ____/s/ Garr M. King_____
> Garr M. King
> United States District Judge

Page 21 - OPINION AND ORDER